IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CHARLES HOOK, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 5:10-CV-239(MTT) |
| INTELIUS, INC., *et al.,* | ) ) | |
| Defendants. | ) ) | |

## ORDER

This matter is before the Court on the Defendants' Motion to Dismiss (Doc. 6) and the Plaintiff's Motion to Strike (Doc. 12). For the following reasons, the Motion to Strike is denied, and the Motion to Dismiss is granted.

### I. STATEMENT OF FACTS COMMON TO ALL MOTIONS

On August 20, 2009, the Plaintiff visited Intelius.com, a website owned by the Defendants, for the purpose of searching for the email address of Betty Hoskins. Using his debit card, the Plaintiff paid $1.95 for a report listing Ms. Hoskins's email address. The Plaintiff alleges that Intelius then used his debit card information to charge him $19.95 for an "Identity Protect" membership program, a charge he would incur monthly for six months until February 2010. The Plaintiff claims that he never authorized these charges and never agreed to purchase an Identity Protect membership. The Plaintiff claims that "Intelius has intentionally omitted material information from consumers and has done so under fraudulent pretenses, consumers are deceived and are likely to continue to be misled or deceived by the language, layout, process, procedures, and organization of the Intelius.com website, including the website's complete failure to properly disclose material

information attendant to its use (such as Intelius'[s] appropriation of consumers' confidential credit, debit, or charge card information to surreptitiously enroll them in Intelius programs)." The Plaintiff does not attach to his Complaint copies or recreations of the webpages he visited, nor does the Plaintiff make any specific factual allegations regarding the content of the webpages.

The Plaintiff asserts the following claims: for violations of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*; for violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.*; for unjust enrichment under Georgia law; and for violations of Georgia's Uniform Deceptive Trade Practices Act ("GUDTPA"), O.C.G.A. § 10-1-370 *et seq.* Moreover, the Plaintiff seeks to pursue these claims on behalf of a class of similarly-situated plaintiffs.

In lieu of an answer, the Defendants filed a Motion to Dismiss for failure to state a claim. The Defendants attached to their motion screenshots of the webpages the Plaintiff would have seen on August 20—but these screenshots were not screenshots of the actual webpages, but "true and correct cop[ies] of the webpages that resulted from running plaintiff Hook's email lookup search request on the regenerated archived code from August 20, 2009." Thunen Dec. ¶ 8. These screenshots were "regenerated from Intelius'[s] back-up tapes and servers on or around July 1, 2010 . . . ." Thunen Dec. ¶ 4. The process for regenerating the webpages was as follows:

> 5. In the normal course of its business, Intelius periodically creates snapshots of its websites as they exist at specific points in time. Those snapshots are taken and preserved on back-up tapes via an automated process. These point-in-time snapshots consist of the software code on which the webpages and webpage flows for a specific date are based.
>
> 6. On August 2, 2009, Intelius archived a true and correct point-in-time snapshot of Intelius'[s] website code.

> 7. The August 2, 2009 code was updated and rolled forward to August 20, 2009 (the date of plaintiff Hook's transaction), by applying any changes that were made to the component files during the intervening 17 days. The version history of each component file is archived separately on Intelius'[s] servers. Changes to the files comprising the August 2, 2009 website code were made through 18 code changes between August 3, 2009 code to reproduce the website code as it existed when accessed by Plaintiff Hook on August 20, 2009.

Thunen Dec. ¶¶ 5-7.

The screenshots of the transaction flow webpages show that the Plaintiff was informed, multiple times, that he was receiving his email report for $1.95, rather than the usual $4.95, only because he was signing up for a seven-day free trial of Identity Protect. He was also informed that if he did not cancel his Identity Protect membership before the trial expired his free trial would convert to a paid membership and he would be billed $19.95 per month until he canceled his membership. The screenshots will be described in more detail below, but to give one example of such disclosures, one of the screenshots contains the following statement: "After your 7[-]day free trial, if you do not cancel your Identity Protect membership your credit card will be billed $19.95 plus tax where applicable and each month thereafter that you continue your membership. You may cancel anytime." Def.'s Mot. Dismiss Ex. 1-A at 5. Based on these screenshots, the Defendants argue that the Plaintiff fails to state a claim and that his case should be dismissed.

The Plaintiff filed, along with his Response to the Motion to Dismiss, a Motion to Strike the screenshots. The Plaintiff argued, correctly, the general rule that on a motion to dismiss a court may only consider the complaint and any documents attached thereto. *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir. 2002). However, a court may consider documents attached to a responsive pleading if (1) the document is central to the plaintiff's complaint, and (2) the document is undisputed, which means that the plaintiff does not or cannot reasonably dispute the document's authenticity. *Id*; *see also Keithly v. Intelius,*

*Inc.*, 2011 WL 538480 at *2 (W.D. Wash. Feb. 8, 2011). Otherwise, to consider the attached documents the court would have to convert the case to a motion for summary judgment, a move that would require allowing extensive discovery. *Horsley*, 304 F.3d at 1134.

The Plaintiff argues that the Court should strike the screenshots because he disputes their authenticity, and that the Court should not convert the Motion to Dismiss to a motion for summary judgment. The Defendants do not dispute that the law cited by the Plaintiff is correct, but deny that the Plaintiff reasonably disputes the screenshots' authenticity. In an Order (Doc. 31) entered November 30, 2010, the Court concluded that the screenshots would be essential to a determination of the issues in the case. Given the seemingly clear disclosures in the alleged screenshots, the screenshots, if authentic, would likely be fatal to the Plaintiff's case. If this were the case, "it would be a waste of this Court's resources to refuse to consider [the screenshots] on a Motion to Dismiss and to allow the case to proceed to discovery." Thus, the Court allowed the parties three months to conduct discovery on the issue of authenticity and an additional month to file follow-up briefs. Discovery has now concluded and the issue has been fully briefed.

## II. Discussion on Motion to Strike

Initially, the Court notes that the Plaintiff misstates the issue presented on the Motion to Strike. The Plaintiff erroneously claims that this Court's Order set the issue as "whether the Disputed Screenshots are copies of the actual webpages Mr. Hook viewed." This is not the case. The Court, in its Order (Doc. 31), stated that the parties would be allowed "to conduct limited discovery regarding the authenticity of the Webpages." The Defendants have never claimed that the pages were copies of the actual webpages visited by the Plaintiff. In fact, as the Defendants' witness would testify later at a deposition,

Intelius's process "is not to take screenshots of every page that every customer visits"—such a process "would be ridiculous." Shah Dep. 35:7-8. Rather, the Defendants contend that the screenshots are "true and correct cop[ies] of the webpages that resulted from running plaintiff Hook's email search request on the regenerated archived code from August 20, 2009." Thunen Dec. 1 ¶ 8. Therefore, the issue is not whether the screenshots are copies of any webpage actually viewed by the Plaintiff, but whether they are what the Defendants purport them to be, i.e., accurate reproductions, generated by a process, of the pages displayed to the Plaintiff on August 20, 2009.

Nontestimonial evidence must be authenticated according to Fed. R. Evid. 901 in order to be admitted. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a). The Defendants claim that they have authenticated the screenshots according to Fed. R. Evid. 901(b)(9), which deals with the authentication of a process or system. The Court agrees that this is the proper method of authentication. According to the Advisory Committee Notes on Rule 901(b)(9), that rule "is designed for situations in which the accuracy of a result is dependent upon a process or system which produces it. X rays afford a familiar instance. Among more recent developments is the computer . . . ."

To authenticate a process or system according to Rule 901(b)(9), the Defendants must present "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Moreover, "'[i]t is not necessary that the computer programmer testify in order to authenticate computer-generated documents.' . . . A computer printout may be authenticated by 'one who has knowledge of the particular record system.'" *U-Haul Int'l, Inc. v. Lumbermans Mut. Cas.*

*Co.,* 576 F.3d 1040, 1045 (9th Cir. 2009) (quoting *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985); *see also United States v. Young Brothers, Inc.*, 728 F.2d 682, 694 (5th Cir. 1984). Here, the Defendants provided testimony of and affidavits from representatives at Intelius who had knowledge of the process: Niraj Shah, the co-founder and Senior Vice-President of Engineering; Ronald Thunen III, who at the time of the transaction at issue was Product Owner for the Consumer Information Services Group, which includes the Intelius website; and James Adler, Chief Privacy Officer and General Manager of Data.

According to Intelius's witnesses, a "screenshot" is "an image of the window that was rendering [the Intelius] pages." Shah Dep. 27:24-25. To render the screenshots, Intelius used a process that was "standard" for both Intelius and "the industry." Shah Dep. 44:4-9. This process used "technology to create [the Intelius] site at that given time and . . . rendered the[] pages as they were on that date"—i.e., August 20, 2009. Shah Dep. 40:8-12. To create a page at a given time, Intelius begins with a snapshot of the website code at a certain point in time. Thunen Dep. 61:11-16. The snapshot is created by "an automated process that takes snapshots of the website code on a routine basis." Thunen Dep. 61:11-16.[1] Here, the snapshot on the date closest to August 20 was August 2. To render the pages, Intelius created a "sandbox"[2] of the site at the time of the snapshot, to which were added changes to the code that occurred between the snapshot (August 2)

---

[1] When asked, "So what is the basis of knowing that it was true and correct," Thunen replied, "I guess it is belief in the process. It automatically does this. It is not directed by a person who could choose not to do it, it just occurs at points in time. This is the point of time of which we have a tape." Thunen Dep. 61:17-23.

[2] Shah described a sandbox more fully as follows: "Again, we make a -- because we have technology, many technologies sitting on a single server, you have got to isolate basically this version of our site and so you have got to basically put walls and encapsulate it so that you can run the site as-is per a given time period, so we build a technology, which is standard again in the industry, and we use that to build a sandbox to build this site." Shah Dep. 30:1-8.

and the search (August 20). Shah Dep. 37-41. Then, Intelius would run the search run by the Plaintiff and photograph (or print the screen of) each page rendered. Thunen Dec. ¶ 8; Thunen Dep. 68:4-7 and 81:21-25.[3]

Evidence of this process alone is sufficient to support a finding that the process used is standard in the industry and produces an accurate result. In addition to this evidence, though, the Defendants also present testimony from James Adler, who was responsible for checking the Intelius site to ensure that certain disclosures were included. This is significant here because these are the very disclosures that appear on the screenshots. Adler testified that various disclosures appeared on pages for various other products on August 3, but appeared on all products, including Identity Protect, by August 12. Adler Dep. 16:5-12. Adler testified as follows:

> Q. Did you go on the website yourself to view the website?
>
> A. Yes. I typically do that.
>
> Q. On August 12?
>
> A. Yes.
>
> Q. And when you viewed the website, were the[ disclosures on p. 4] there?
>
> A. Yes.

---

[3] While Intelius did not keep screenshots of every page visited by the Plaintiff, there are records that indicate what the Plaintiff did while on the intelius.com website. For instance, when asked, "So is there a record of Mr. Hook's page views from his transaction on August 20, 2009," Mr. Shah responded: "There is from a server perspective on him—or that person making that order, there is a page history of what was delivered from a server perspective to that customer." Shah Dep. 38:11-16. In other words, while Intelius recreated the pages based on the search, Intelius still was able to confirm that these pages were the ones seen by the Plaintiff. The content of those pages, however, has to be recreated by the sandbox method because a screenshot of the exact page is "impossible to take"—indeed, to take screenshots of every page a customer visits "would be ridiculous." Shah Dep. 35:1-8.

Adler Dep. 14:1-8. Adler testified that he was sure that he made those changes because on August 12 he was able to report to the Better Business Bureau that all of the changes it required, including the disclosures at issue here, were made by then. Adler Dep. 13:3-5.[4]

The result of all this is that the Defendants more than satisfied their burden of authenticating the screenshots. Moreover, the Plaintiff's challenges to the screenshots and the Defendants' evidence of authenticity are unavailing. Some, such as his arguments regarding the sufficiency of some of the Defendants' affidavits, are not helpful. Others, such as his arguments about certain "inaccuracies" in the rendering of the screenshots, are misleading. The Plaintiff's only challenges to the screenshots thus wholly miss the mark. Tellingly, the Plaintiff never attacks the Defendants' methodology. For example, the Plaintiff offers no evidence that the Defendants' methodology is unreliable, or that the Defendants are unable to recreate what they claim to have recreated. Nor did the Plaintiff identify any discrepancies between the pages he claims he saw and the screenshots.

In effect, the Plaintiff argues that the Defendants' witnesses are unworthy of belief; indeed, that they have concocted a grand scheme to cover their fraud and, in the process, to defraud the Court. In a way, the Plaintiff has a point. Either the screenshots are authentic, or the Defendants are manipulating evidence and perpetrating a fraud on the Court. Of course, such a scheme, if it existed and once discovered, would subject the Defendants and their attorneys to the harshest possible sanctions. But, as yet, there is not a scintilla of evidence suggesting that the Defendants have manufactured evidence to

---

[4] As the Plaintiff points out, the Defendants have had some difficulty with consumer protection agencies and private litigants who have raised allegations similar to those asserted here by the Plaintiff. Perhaps this explains why some or all of the critically important disclosures were added shortly before the Plaintiff's August 20 purchase and why Adler verified that the Better Business Bureau-demanded disclosures were added to the Defendants' websites.

perpetrate a fraud on the Court. Because the Plaintiff does not otherwise attack the reliability of their methodology, the Defendants have carried their burden and the screenshots have been authenticated.

The result here is similar to that in *Keithly v. Intelius, Inc.*, another case involving Intelius, Inc. in which the plaintiffs asked the court strike webpage recreations such as the ones in this case. The issue in that case was the same: whether the court could consider the webpages as incorporated by reference, or whether the plaintiffs disputed the webpages. The court held that it could consider the webpages at the motion to dismiss stage. As here, "Plaintiffs [did] not . . . present[] any evidence to contradict defendants' representations and d[id] not affirmatively identify any discrepancies between the webpages they saw and those presented by defendants with their motions." 2011 WL 538480 at *2. As a result, the court found "that the accuracy and authenticity of the screen shots [we]re not reasonably in dispute." *Id.* at *2.

The Plaintiff has not shown why the result should be different here. The contents of the screenshots are not reasonably in dispute. Therefore, the Plaintiff's Motion to Strike (Doc. 12) is **DENIED**. The Court will consider the screenshots in reaching its result on the Motion to Dismiss.

### III. DISCUSSION ON MOTION TO DISMISS

Having determined that the screenshots have been properly authenticated, and that the Plaintiff has not raised any objection that would cast legitimate doubt on the authenticity of the screenshots, the Court must now consider the screenshots to determine if they would support any of the Plaintiff's claims for relief.

## A. Screenshot Descriptions

There are eleven pages of screenshots representing the pages viewed by the Plaintiff on August 20. These screenshots can be found in the appendix. However, for the sake of a complete record, they are described, laboriously, herein.

The first page is a screenshot of a page from theultimates.com, a partner of Intelius, "a page of search forms to allow people to search for something." Thunen Dep. 75:7-9. On this page, a customer can run searches under "PEOPLE SEARCH," "REVERSE CELL PHONE SEARCH," "YELLOW PAGES," "SEARCH BY PHONE," and "EMAIL SEARCH." On this page the Plaintiff "indicated . . . that he was interested in searching for an email search for Betty Hoskins in the state of—City of Boston in the state of Georgia and the search criteria is passed on to Intelius . . . ." Thunen Dep. 75:19-24. In order to trace the Plaintiff's transaction through the site, "somebody at Intelius on June 30[, 2010] entered the name Betty Hoskins" on the recreated webpages to create the subsequent pages. Thunen Dep. 76:2-6.

The second page is the page "where customers land on the Intelius site." Shah Dep. 32:25-33:1. "Intelius generates this page to indicate that a search is in progress" on the Betty Hoskins "search terms." Thunen Dep. 75:23-24.

The third page is the results page where two results were displayed. Both results, "1" and "2," are for Betty Hoskins and show the same redacted email address, "H***O@___.NET," and the same city, "Boston, Georgia," and have a check mark that indicates that a postal address is available. Above these results is a red button that says "See Email Details on All 2 People!" In addition, below each redacted email address is a red button that says "View Complete Email;" the impression this gives is that, rather than

purchase both email addresses, the customer can purchase one or the other instead. There are also various other links and various certificates.

On the fourth page, pricing information appears for the first time, as well as the first mention of Identity Protect. In a blue box it says "You have selected the following package." Below it is another box, white but outlined with a broad, light-blue border—this presumably is the package mentioned above. The first line of the text in the box says "Instant Email Lookup Report," followed by, on the second line, "Includes All 2 Email Lookup Records for Betty Hoskins in GA." Below that is the text, "Report includes when available," followed by four phrases—"Personal Email Addresses," "Postal Address," "Business Email Addresses," and "Location Details"—and next to each is a large red checkmark. Below this, but still in the blue-bordered box, are two other boxes representing two choices for the customer. The first box is light blue and has a price of $1.95, which, according to a dark-blue, circular button with white text, is "60% Off." This option is a "Special Price," and there is a link below this phrase where the customer can "Learn More." Below all of this is a large, rectangular red button that says "Add to Cart," and below this it says "With FREE Identity Protect Trial." Below this dark-blue box is an off-yellow box that contains the price, $4.95, a statement that this is the "Regular Price," and a large, rectangular, dark-blue button that says "Add to Cart." The unmistakable impression one gets from viewing this page is that there are two purchase options: one, at the "Regular Price" of $4.95, and another at the "Special Price!" of $1.95, which is 60% off and comes with a "FREE Identity Protect Trial." However, it is not clear at this point that the 60% discount is conditioned on the customer selecting the free Identity Protect trial.

The fifth page contains an explanation of the Identity Protect free trial as well as an order summary. This page is particularly instructive and is reproduced below, with emphasis on the relevant language.



Ex. 1-A Page 5

Near the top of the page is a strip of dark blue in which is written, in white letters, "Instant Email Lookup with Identity Protect Trial." In a large box with a broad, light-blue outline are summaries of the "Instant Email Lookup," "Identity Protect Benefits," and a description of the price. The email lookup description is identical to the one on the previous page. Below that is the description of Identity Protect benefits, which consists of a list of

-12-

benefits—such as "Monthly Credit Reports," "24/7 Recovery Services," "$25,000 Identity Theft Insurance," etc.—followed by the "Offer Details," which are in a slightly smaller font-size. The offer details are as follows:

> Click "Continue" button to accept this special offer price and activate your trial membership to take advantage of the great benefits that Identity Protect has to offer. The membership fee of $19.95 per month will be charged/debited by Intelius.com to the credit/debit card you use today with Intelius.com after the 7-day trial. Special Offer only available to Non Identity Protect Customer.

Below this description are hypertext links for "Additional Offer & Benefits," "Terms & Conditions," and "Privacy Policy." In a column to the right of the Email Lookup and Identity Protect details, but still in the same box, is a blue-green button that says "60% off," below which is the price, "$1.95," with a red button that says "Continue." Below the red button is a brownish-grayish button that says "Remove Identity Protect Trial," followed by "Pay Regular Price of 4.95." At this point, the ambiguity of the previous page with respect to the Identity Protect trial's relationship to the discount, is resolved, one can only receive the $3.00 discount by signing up for a free, seven-day trial of Identity Protect.

Next to this box on the fifth page is the "Order Summary," which relates the following:

| | | |
|---|---|---|
| 1. | Instant Email Lookup<br>*Identity Protect Discount*<br>*You saved $3.00* | $1.95 |
| 2. | Identity Protect Trial<br>*Cancel anytime. After*<br>*your trial, you will be*<br>*billed $19.95 per month*. | $0.00 |
| | **Total** | **$1.95** |
| | **You saved** | **$3.00** |

Below this Order Summary, in a slightly smaller font, there is another description of the Identity Protect trial: "After your 7[-]day free trial, if you do not cancel your Identity Protect

-13-

membership your credit card will be billed $19.95 plus tax where applicable and each month thereafter that you continue your membership. You may cancel anytime."

On the sixth page there is an option to "Select Add-Ons" for a price. To the right of this, there is another "Order Summary" with content identical to that on the fifth page, minus the additional disclaimer (i.e., everything below "**You saved** $3.00"). Nevertheless, it still informs the customer that there is an "Identity Protect Discount," that the customer "saved $3.00" because of it, but that the customer can "cancel anytime" and that, "After your trial, you will be billed $19.95 per month."

On the seventh page, the same "Order Summary" as on previous pages appears, along with spaces for the customer to fill in his billing information. The customer is informed that his "credit card statement will reflect a charge from Intelius for $1.95 for this purchase." After this disclosure is a red, rectangular button that says "Confirm the Purchase and Show My Report," along with a disclaimer that informs the customer that "[b]y clicking the Confirm Purchase button above I accept the Intelius Terms and Conditions."

On the eighth page, the customer is informed that his order has been successfully completed, and there is a full-page advertisement for a "ValueMax" membership. The ninth page is like the second in that it is a transition page. This one informs the customer that the website is generating a report and asks that the customer wait. The tenth page is the report, and the final page "is a receipt email." Thunen Dep. 73:11-18. This email summarizes the transaction. It shows that the customer purchased an Instant Email Lookup for $1.95 and an Identity Protect Trial for $0.00, and that he saved $3.00, but it does not provide any information about terminating his Identity Protect Membership.

**B.     The Plaintiff's Claims**

*1.     The Plaintiff Fails to State an EFTA Claim*

Congress enacted the EFTA "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems. The primary objective . . ., however, is the provision of individual consumer rights." 15 U.S.C. § 1693. An "electronic fund transfer" is "any transfer of funds other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(6). At issue here, in particular, is a "preauthorized electronic fund transfer," which is "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9)

The Plaintiff claims that the Defendants' deduction of funds from his account for his Identity Protect membership after the initial free trial ended was an "unauthorized electronic fund transfer," which is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." The Plaintiff's claim fails because there is no way in which the transfer of funds could be construed as unauthorized. Indeed, the Plaintiff was informed five times before he entered his payment information and clicked "Confirm the Purchase and Show My Report" that he was signing up for a free trial, that the free trial would end and he would be billed $19.95 a month for the service until he canceled. Rather, than an "unauthorized electronic fund transfer," this is clearly a "preauthorized electronic fund transfer." Therefore, the Plaintiff fails to state an EFTA claim.

*2.    The Plaintiff Fails to State an ECPA Claim*

The Plaintiff's ECPA claim must also fail. The ECPA provides that "a person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept, any wire, oral, or electronic communication . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)." 18 U.S.C. § 2511(1)(a). To "'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). However,

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(a)(iii)(c). Even assuming, without deciding, that when the Plaintiff provided his debit card information to Intelius on August 20, Intelius intercepted this information under ECPA, it is not actionable because Intelius clearly falls into the exception. Here, Intelius, as a party to the communication, received the Plaintiff's information and, rather than use it for a tortious or criminal purpose, used the information for the purpose it was given--to pay for the Identity Protect service purchased by the Plaintiff. Therefore, the Plaintiff fails to state an ECPA claim.

*3.    The Plaintiff Fails to State a Claim for Unjust Enrichment*

Under Georgia law, "Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Tuvim v. United Jewish Communities, Inc.*, 285 Ga. 632, 635,

680 S.E.2d 827, 829-30 (2009).  Thus, the Plaintiff's unjust enrichment claim fails for two reasons.  First, there clearly was a contract between the Plaintiff and Intelius.  Plaintiff would only have to pay $1.95 for an Email Lookup Report, a report that otherwise would cost $4.95, if the Plaintiff agreed to a free trial of Identity Protect, a trial that would end after seven days, after which the Plaintiff would have to pay $19.95 per month.  Second, Intelius was not unjustly enriched.  The nature of the free trial of Identity Protect and the consequence of not cancelling within seven days were disclosed to the Plaintiff several times before he completed his transaction.  At the end of the seven-day trial, the Plaintiff did not cancel his membership.  In fact, it took the Plaintiff six months to cancel his membership.  Intelius, after disclosing the terms of the deal, performed according to the terms agreed to by both parties and had no reason to discontinue the Identity Protect service until notified by the Plaintiff.  Therefore, the Plaintiff fails to state an unjust enrichment claim.

*4.     The Plaintiff Fails to State a GUDTPA Claim*

The Plaintiff's final claim is for a violation of GUDTPA.  The Plaintiff makes several conclusory allegations regarding Intelius to support its GUDTPA claim, and the Court will address each in turn.

First, the Plaintiff claims that the "Defendants passed off their membership programs to Plaintiff and Class members as belonging to another."  This language closely tracks the language of O.C.G.A. § 10-1-372(a)(1).  The allegation is simply a legal conclusion that the Plaintiff insists that the Court adopt as its own; indeed, the Plaintiff has failed to allege a single fact that would support such an allegation.  The thrust of the Plaintiff's Complaint is that Intelius took information it received through the Plaintiff's purchase of an Email Lookup Report and used it to enroll the Plaintiff in another Intelius

service, the Identity Protect program. There is no allegation anywhere in the Complaint that Intelius "passed off" identity protect as belonging to another.

Next, the Plaintiff claims that the "Defendants' unauthorized enrollment of Plaintiff and Class members in Defendants' membership programs caused actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of such programs." The Plaintiff also claims that the "Defendants' unauthorized enrollment of Plaintiff and Class members in Defendants' membership program caused actual confusion or actual misunderstanding as to affiliation, connection, or association with or certification by another." Again, the language very closely tracks the statutory language. *See* O.C.G.A. §§ 10-1-372(a)(2) and (3). As the Court ruled above, however, the Plaintiff clearly authorized his enrollment in the Identity Protect program. Moreover, there are no factual allegations that would support the Plaintiff's bare legal conclusions about the "source, sponsorship, approval, or certification" of Intelius, or the "affiliation, connection, or association with or certification by another." In fact, there are no allegations that Identity Protect is either owned by another entity, sponsored by another entity, or that Intelius tried to get the Plaintiff to think that it was.

Finally, the Plaintiff alleges that the "Defendants failed to reveal material facts and information about Defendants' membership programs, which did, or tended to, mislead Plaintiff and Class members about facts that could not reasonably be known by the consumer," and that the "Defendants failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner." Unlike the other GUDTPA allegations, the Court cannot find a statutory basis for these legal conclusions of the Plaintiff. However, these allegations are no more true than any others that the Plaintiff has made. Again, Intelius disclosed the details of the Identity Protect program at least five

times before the Plaintiff made his purchase. One wonders, if these five disclosures were not sufficient to make the Plaintiff aware of the nature of the transaction, what would have been? As none of the Plaintiff's GUDTPA allegations can withstand legal scrutiny, he has failed to state a GUDTPA claim.[5]

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff has failed to state a claim upon which relief can be granted. Therefore, the Motion (Doc. 6) is **GRANTED** and his Complaint is **DISMISSED**.

**SO ORDERED**, this the 28th day of March, 2011.

                                                S/ Marc T. Treadwell
                                                MARC T. TREADWELL, JUDGE
                                                UNITED STATES DISTRICT COURT

jch

---

[5] It seems possible that the Plaintiff, in making these GUDTPA claims, has followed the lead of other plaintiffs who have raised similar claims against Intelius. In those cases, however, Intelius was referring customers to a third-party website to purchase additional services. This is not the case, here, where all of the products purchased by the Plaintiff were products owned by Intelius. Perhaps, as in the case of the new disclosures added at the insistence of the Better Business Bureau, Intelius is "cleaning up its act." In any event, here Intelius has not done as the Plaintiff alleges.